Our third case for this morning is Brousil against the U.S. Department of Labor and BNSF Railway. So we'll hear when you're ready Mr. Rudd. May it please the court, Ken Rudd on behalf of Michael Brousil who is the complainant appellant in this case. As this court knows this is an FRSA case and I would say at this point it is predominantly a case that's calling upon for answering a question concerning the extent of the statutory right to refuse work and when the employee must be compensated for the employer's violation of that right. With respect to incidents two and three that is precisely what occurred in both of those cases, both of those two incidents that we've briefed before the court. Mr. Brousil refused to do work and the administrative law judge ALJ Merck made the decision that his refusal to do the work was statutorily protected. Despite that statutory protection the BNSF Railroad went ahead and cited him for violations of various rules in their agreement. So Mr. Rudd let me interject but let's take incident number two as an example. I too I break the facts down a little bit more than you just did because he was certainly entitled and indeed because of incident one may have been especially sensitive to the fact that you shouldn't pull the train out without that green light on showing that the doors are all closed. So far so good but then a you know further action happens. You don't just sort of stop the world the minute you've done that and I understand that BNSF had an alternative more cumbersome but an alternative method which was to check each door manually and then give the word to the engineer that you could go off and it was it was that Mr. Brousil refused to entertain any solution to the problem and in particular refused to implement what they're what you all are calling the old way of manually checking and it was quite disruptive in the station. So I don't see this as anybody punishing him necessarily for calling to the railroad's attention the initial problem, the malfunctioning light, but it's it was his unwillingness to work through the solution that seems to be what the railroad was concerned about. Well let me respond in this fashion. Certainly Mr. Brousil brought it to the railroad's attention but then he did something else that he was entitled to do under the statute which was refused to take a piece of equipment and use a defective train or let's call it a train for simplicity refused to take a defective train until the railroad either properly repaired the train or replaced the train which is precisely what the statute as we've put in our brief requires that the employer do is repair or replace not have the employee do some unsafe workaround. But why do we know that that is an unsafe workaround? I mean it seems like a very rigid standard if there is a way of solving the problem. The issue is don't operate the train with a door open. You don't want tragedies such as Rachel Barton Pines tragedy to happen. But checking the doors manually, the railroad took the position was a safe way of solving that problem slower. I'm sure the train would have been behind schedule but nonetheless safe. Do we know that there's absolutely no room for a safe workaround? Well your honor, I would respond by saying and I think if you read the disciplinary transcripts and discussions of what the employees do, they do that already. That's done every time. The old way is still the way that's used but on top of that, they have this light system which obviously if you have three train employees, a conductor and two train men who are working the train, they can only go visually observe so many vestibule doors at the time. They can go and check three cars but if you have five or six cars in the train, you can't have three men guard all six cars. That's the reason this light system was put into one of the reasons this light system was put into effect so that even though the employees couldn't check, couldn't be there for the doors immediately there and protect them, they would have somebody who could tell whether or not the door was being open. And quite frankly, I was reminded of this myself last night when I tried to keep the elevator door open over at the Palmer and got my hand caught in it. And we all know that that happens both in buses and cars. They try to board a car. They try to open the door and if the door slams shut on them and they take off, well, maybe the doors were checked by the train men as they should be. But it sounds like your challenge is to BNSF's manual in which the supervisor was following saying use the alternative method to ensure that the doors are closed. I mean, we don't know. I mean, I don't know. Maybe you can tell me and I just missed it how many cars there were in this train for July 29, 2013. I don't recall if that's... It varies with BNSF. That's correct. But my point is that that is done. I mean, the light system is a step on top of that. They checked the train. In fact, Mr. Amin Ra, who was the train man on the February 5 train when the door was left open or came open, he checked all the doors. Went outside as they're supposed to do and looked down the track to make sure that all the red lights were illuminated, I think, and started off. And if they're all illuminated, then that means the doors are closed. He did that. Nonetheless, the door was left open. And like I say, this light system, this green light door indicator system is there for a purpose. It's there for protection. I understand that. What about incident number three where the disabled passenger can't get on board? I understood from reading the briefs that there was even a manual system to use for that. But instead, Mr. Brussel just kind of walks off because there's a lot of diesel pollution in the station. And he did walk off. And in fact, what happened was they used the head end power. I mean, this was a situation where he was either going to be forced to do what they wanted to do, which was to turn on the head end power, or someone else was going to do it. Well, why is the manual system not explored? I assume that... That would be a way of doing it without plugging it. I know that this bump thing, you know, that he was too far away for the electricity to reach. Well, the manual system, I'm sure, was not used by the railroad because turning on the head end power is quicker. They can turn it on. And it's my understanding it takes, you know, 15 to 20 minutes to manually crank the... It's just a lift, I think, right, to get the person... Right. When you use the manual one, though, they have to get a crank out and crank it up. With the diesel, they turn it on and drive it up electrically. But that's the reason obviously those were things that the railroad, they chose to use the head end power on that instance anyway. That was their choice. They didn't intend to go ahead and do it manually. If they had done it manually, it's my understanding it's the conductor's job to actually raise the lift manually. But in this instance, it was the railroad that chose to go ahead and then... I don't know what that was. To use the head end power system, which was a quicker and, I guess, in their mind, more efficient way to do it. And Mr. Brazil obviously didn't want to have any part with that. Because if he does it once, then they say, well, you turned on the head end power that time. Now you can't refuse anymore because you agreed that you could do it safely. And it was his position all along that the head end power shouldn't be used inside the Chicago Union Station. And I see that I have my five minutes that I've had reserved for rebuttal. So, once the court has a question they want me to answer right now, I'll return at the end of counsel's. Okay. That would be fine. Thank you. So, we have Mr. Mirachi. Is that how you spell, pronounce it? Yes. Thank you. May it please the court. My name is David Mirachi and I'm here on behalf of the Appley Secretary of Labor asking this court to affirm the board's dismissal of Brussels' FRISA whistleblower claim. This court should affirm because substantial evidence supports the conclusion of both the ALJ and the board that BNSF met its burden to establish its affirmative defense that it would have taken the same action against Brussels in the absence of his protected activity. Thus, this same action affirmative defense provides that an employer cannot be liable under FRISA if it shows by clear and convincing evidence that it would have taken the same disciplinary action against the employee based on that employee's misconduct, even if the employee had not engaged in FRISA protected activity. So, the thing that's tricky to tease out in this case is where does the protected activity end and where does activity that the railroad would be within its rights to discipline for begin because these are both very close cases it seems to me. You know, he had just been disciplined for the February incident with the door being open and now it's July and he's like, I've learned my lesson. I'm not going to move if that green light indicating that all of the doors are closed isn't properly illuminated and he discovers that now he's being punished for that. So, kind of damned if you do, damned if you don't. And with respect to incident number three, running these diesel engines inside the confines of I won't even tell you what I know about that, but it creates a very oily, heavily polluted air and I guess the problem with moving this bump piece, I keep forgetting the name of it, but anyway, the end of the line was that they needed longer electrical lines. So, he's really stuck. He can't get up to use the clean energy, the plug-in. He can't see what he's doing. You're not supposed to operate one of these immense things without being able to see what you're doing. That seems quite reasonable. So, why isn't he entitled in each of these instances to register his objection and why didn't they, why isn't it the case that they fire or they, I'm sorry, they discipline him for protected activity? In both incidents two and three, his protected activity was reporting his safety concern. He was reporting what he believed to be a hazardous condition and both the ALJ and the board found that as to instance two and three, there was a safe, reasonable alternative. And for instance, when it comes to incident two, he was not stuck between a rock and a hard place because Mr. Brussel was familiar with POM 1.2.4, which established the protocol if the light is not working that you go the old way. And he even had experience implementing POM 1.2.4. And the ALJ and the board's finding that that was a safe and reasonable alternative is entitled to substantial evidence review. And so, it must, you know, we must go along with that finding unless it is so out of bounds that no reasonable fact finder could have possibly considered going the old way under POM 1.2.4 to be a safe, reasonable alternative. So, are you arguing that we can't consider then whether POM 1.2, basically the old way, was just as good as or at least good enough for this purpose? Because what Mr. Rudd argues is, you know, maybe at moment one all of the doors are closed, but then if you're relying on the modern technology, you'll know at all times that the doors remain closed, whereas using this simple observation method isn't a guarantee that they're going to stay closed. Well, just because using the door indicator light is superior, that's not sufficient to establish that going the old way under POM 1.2.4 is unsafe. And the ALJ and the board considered, you know, the facts here and they found that using that 1.2.4 was safe. And so, again, I think the problem is that Mr. Brussel is not accounting for the substantial evidence review standard. Even if a reasonable fact finder could theoretically find that it's not safe to implement 1.2.4, that's not nearly sufficient for Brussel's appeal to continue here. His appeal should be dismissed and in part regarding incident two, because it is very much the case that a reasonable fact finder could have reached the conclusion that going the old way under 1.2.4 was a safe, reasonable alternative. I also, in my limited remaining time, wanted to direct the court's attention to Formello, which we only briefly mentioned in the secretary's brief, but it's important to this case because it's from the Seventh Circuit. It demonstrates that this court recognizes that in whistleblower cases, it is appropriate to separate out protected and unprotected aspects of a single incident. So in Formello, the single incident was in fact a single outburst by a truck driver who refused to drive a truck. The protected aspect that this court identified was that he was raising a safety concern. He was refusing to drive the truck, because he was worried about safety. But what this court found was unprotected was his angry and aggressive conduct that amounted to insubordination in the way in which he was going about his refusal to perform the work. And so this court recognizes that when you're analyzing the nature of an employer's discipline, it is appropriate to separate out protected and unprotected aspects. And when we have findings from the ALJ and the board that there were totally uncooperative and not willing to work with anyone to find an alternative solution or participate in any discussion about how to safely resolve the problem, that for those reasons, this case must be dismissed. All right. Thank you very much, Mr. Prude. Thank you, Your Honor. May it please the court. My name is Mike Prude on behalf of the intervening respondent, BNSF Railway and Company. I want to start with an issue that the court has been exploring with my colleagues this morning, which is in fact that my opposing colleague mentioned is what this case is primarily about. He said this is primarily a case about the statutory right to refuse to work. And we would take issue with that. We would direct the court back to Mr. Brossel's original complaint in this case. This case has always been about reporting unsafe conditions. It has never been about refusing to work, at least not in its origins, the way that he pled the case, and the way that it originally proceeded. Well, as I understand, he links them together. You report the unsafe conditions. It's kind of like the captain of an airplane or something. You have the ultimate right to say I'm not going to operate with this warning light blinking at me or whatever it may be. He does link them, Your Honor. You're right. The reason that the distinction is very important is because there are different statutory provisions that apply with respect to reporting an unsafe condition versus refusing to work. The refusing to work portion of the statute, which is under B1b, talks about that refusing to work is protected activity only if the conditions that are described in sub 2 exist. And sub 2 has a number of things that have never been discussed in this case, haven't been briefed, clearly haven't been met. Most notably, sub 2 says that the refusal is only protected if, among other things, no reasonable alternative is available to an employee and a reasonable individual in those circumstances would conclude both that the hazardous condition presents, quote, an imminent danger of death or serious injury, and two, that the urgency of the situation doesn't allow sufficient time to eliminate the danger without such refusal. You have to establish all of those things in order for a refusal to work to be protected under the statute. And there's not been any indication, certainly no argument, about any of those elements here. And so I think that aspect of it gets to a lot of the issues that you were asking my colleagues in terms of do we have to ignore these other things? Do we have to rely on the ALJ's determination? I think what we can say is whether or not that action was protected or not, the refusal to work, that turns on issues that have never been briefed and never been presented to this court. That's the very important distinction that I think we should really focus on here. That then ties in to the other issues that stem from that. So again, here, this is a situation where the ALJ and ultimately ARB concluded that Mr. Brossel had established the elements of his case. So it was established, although the BNSF doesn't agree with it, that he engaged in protected activity. So his protected activity then, your argument is, was his act of reporting both of these problems. A, the failure of the light to illuminate properly, and B, the use of the HEP power source instead of the cleaner electric one. That's absolutely correct. And of course we have a finding from the ALJ that those things were contributing factors to the discipline, which is what brings us to the actual affirmative defense, which is what we're here about. As this court knows, there's a very deferential standard under the APA. Mr. Brossel argues that there was a misapplication of the law. We haven't really gotten into that this morning, but we believe that the ALJ and ARB did exactly what the law requires, which is to look at what the company would have done if the same misconduct had arisen, but without any protected activity. And you're not, are you counting as, you're not counting as misconduct the actual report. You're, you're, if I understand your argument correctly, you're saying the misconduct is that in the first instance his unwillingness to come up with an alternative way of solving the problem, basically. Maybe the second instance too, I don't know. That's absolutely correct. Reporting the incident. I mean two and three is the first and second. That's right. Reporting the concern was not misconduct. That's absolutely correct. It was the refusal then to go on to the next step, which is to say, look, here's these other alternatives. Let's talk about it. It was the most extreme in incident three where he just said, I'm just going to walk off and let someone else deal with it while we've got a disabled passenger here who is understandably upset and can't get on the train. That's what the misconduct is. The second argument that he makes is the one about substantial evidence. We think that is, is clearly not a, an argument he can prevail on. That is a very low threshold as this court knows. It's simply evidence that a reasonable mind would find. It's more the scintilla, but less than a preponderance. And here, especially in the second ALJ opinion, the ALJ was extremely diligent about walking through all the factual findings because the ARB of course had sent it back to the ALJ for that specific purpose. It said, you know, this is a difficult task, but you have to go through this task. And so there's page after page after page of findings. We think any, any one of which would be sufficient under the substantial evidence standard, but certainly in total when we have evidence of a lack of retaliatory motive, a lack of, you know, the BNCF didn't treat him more harshly than it treated other employees. In fact, it treated him better than it treated other employees in similar circumstances. The ALJ went and sort of on and on. And so we think that the very low, very deferential standard is clearly met here. And for that reason, I'm nearing the end of my time. If there's other questions by the court, I'm happy to entertain them. If not, we ask that the court affirm. All right. Thank you very much. Anything further, Mr. Rudd? Yes. I think the most important thing I can do right now is to- Wait, wait till you said, we can, we can record your words here. The most important thing we can do right now is to direct the court's attention to page 24 of ALJ Merck's order. It's in the, it's page 110 of the separate Rule 30B appendix. And I'll just quote if it, if I may. This is his conclusion. He says, I find that complainant engaged in protected activity. And then he talks about one, which is not pertinent to us. Two, on July 29, 2013, when he refused to operate a train without a functional door indicator light. On August 1, 2013, when he refused to turn on the head end power to operate the ADA lift. This is not just merely a reporting incident. This is him saying he, he met the statutory requirement to refuse to do those things. Now- Now your opponent says this is not an issue that has been focused on in terms of the statutory provisions. I've written all the briefs in this case for, on behalf of the appellant, and it is in my first brief to Judge Solomon back in October that, that refusal should be a protected activity. And so it has been brought up and I've brought it up in multiple briefs. And, you know, even though I didn't like the ultimate ruling that Judge Merck gave me on this case, it came out to me crystal clear, this is totally in our favor. Now how he comes up then and says, even though these activities were protected, I'm not going to extend my protection to you fully, is because he gets into this whole issue of whether or not Michael Brosell had a mixed motive in doing. And I, I have to say, Mr., my opponent is, is far more steep in employment law than I am. But I know of no case under the FRSA where the employee's statutory rights. Here, it's pretty clear that ALJ Merck thought that he acted in good faith and on a reasonable basis on refusing to, to do those two things because he finds it right in his conclusion. But then he says, but he had other motivations for this. It wasn't just safety. He was also motivated by what he calls self, self-preservation. He was motivated to avoid getting disciplined or being called up for another hearing for leaving with, with, you know, anything that the, that the railroad said was a violation of the rule. I am not aware of any authority that says that the employee has to have a pure motive if he has met statutory requirements to refuse to work. And that's exactly what ALJ Merck said. So I, ultimately, his ultimate conclusion is it seems to be at war with what he found. If, if my client refusals to work were statutorily protected, then he can't just say, well, we're not gonna, we're not gonna do that because he had other motives in addition to safety. It doesn't make any sense, but this kind of where we've been thrown with the, with the ARB overruling the Thorstenson decision, we're back to really kind of almost anything goes. I guess the ALJ can choose any criteria right now that they want to. And, and I think that's what he did in this case because he didn't have any direction either because Thorstenson and the integral or the, the rulings that had, had been behind that had been kind of wiped out. But this is, this is largely what I'm relying on is that the, that the ALJ found that his activity was protected, but then ruled as if it wasn't. And that, in my opinion, requires reversal and a remand. And unless you have some questions, I'm almost out of time, but. All right. Apparently not. So thank you very much. Thank you. Thanks to all counsel. The court will take the case under advisement.